

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-73,484-02

### EX PARTE NEAL HAMPTON ROBBINS, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### FROM MONTGOMERY COUNTY

*Womack, J., delivered the opinion of the Court, in which Price, Johnson, Cochran, and Alcala, JJ., joined. Johnson, J., filed a concurring opinion. Cochran, J., filed a concurring opinion, in which Price and Johnson, JJ., joined. Keller, P.J., filed a dissenting opinion, in which Hervey, J., joined. Meyers, J., filed a dissenting opinion. Keasler, J., filed a dissenting opinion.*

The applicant, Neal Hampton Robbins, was convicted in 1999 of the capital murder of his girlfriend's seventeen-month-old daughter, Tristen Rivet. The State did not seek the death penalty, and upon conviction the applicant was sentenced to life in prison. We affirmed the judgment and sentence on direct appeal.[1]

---

[1] *Robbins v. State*, 88 S.W.3d 256 (Tex. Cr. App. 2002).

1

The applicant filed his first application for a writ of habeas corpus in 2011, alleging actual innocence based on new evidence and due process claims for the use of false testimony, which we denied.[2]

The applicant filed this subsequent application for a writ of habeas corpus on September 3, 2013, pursuant to article 11.073 of the Texas Code of Criminal Procedure. Article 11.073 was passed during the 2013 legislative session and became effective on September 1, 2013. There are no factual changes in the applicant's case since the filing of his first application. In both applications he argued he was entitled to a new trial because the medical examiner who testified for the prosecution, Dr. Patricia Moore, could no longer stand by her trial testimony regarding the cause of death. The only difference between the two applications is the enactment of the new law upon which the applicant now relies. Based on article 11.073, the applicant argues he is entitled to relief because scientific evidence relied on by the State at trial has been contradicted by relevant scientific evidence that was unavailable at trial, and if it had been presented at trial he would not have been convicted.

We shall grant the applicant's request for relief.

## Background

The relevant facts and procedural background have not changed since the applicant's first application for habeas corpus was denied by this Court in 2011. As we

---

[2] *Ex parte Robbins*, 360 S.W.3d 446 (Tex. Cr. App. 2011), *cert. denied*, 132 S.Ct. 2374 (2012).

summarized previously, the facts as developed at trial and during original habeas proceedings are as follows:

> The victim resided with her mother, Barbara Hope, and her mother's boyfriend, Applicant, at the home of Applicant's mother, Bonni Morris. Applicant and Hope had a volatile relationship, frequently separating and reuniting. Witnesses suggested that both suffered from depression. When seeking group-type counseling, Applicant told a counselor that he did not know what he would do if things got worse, and he feared he would hurt Hope if they stayed together.
>
> Testimony indicated that Tristen and Applicant had a good relationship, but that changed in the months leading to Tristen's death. Applicant's personality began to change after he started taking pain medication for injuries received in a serious car accident. Then, beginning in November 1997, Tristen suffered injuries on three separate occasions while being cared for by Applicant: a bruise under the eye, an injury to her leg or ankle, and finally, a series of bruises across her face. Also, testimony suggested that in early 1998, Tristen became afraid of Applicant. Hope stated that Tristen "didn't seem to care too much for [Applicant] anymore" and seemed afraid of him. Tristen's injuries and change in behavior led neighbor Rhonda Bethune and babysitter Helen McDaniel[3] to express concern that Applicant was hurting Tristen. However, the defense presented several witnesses, including Morris and Applicant's grandmother, brother, and sister-in-law, who stated that Tristen and Applicant had a very loving, father-daughter type of relationship.
>
> On the morning of her death, Tristen was suffering from a cold but was otherwise in good health. Hope, accompanied by Morris, left the house at approximately 11:30 a.m. to attend appointments and run errands. Applicant was entrusted with Tristen's care. Applicant's parole officer, Tim Hurst, visited Applicant between 1:26 p.m. until 2:00 p.m. Hurst testified that he observed Tristen walking around and eating animal crackers, and Tristen

---

[3] McDaniel testified that she called CPS regarding Tristen's injuries, but the agency did not follow up on the case. She also claimed that she left town because she was so scared of Applicant.

asked for some red punch, which Applicant gave her from his own glass. Applicant's brother arrived for a visit at approximately 1:45 p.m. and remained at the home until about 2:20 p.m.

Applicant paged Hope between 3:30 and 4:00 p.m. When Hope called, Applicant sounded "shaky" and "excited" and told her to hurry back to the house because he "had to go and had things to do." When Hope and Morris arrived home between 4:00 and 4:30 p.m., Applicant told them that he had laid Tristen down for a nap shortly after they spoke on the telephone. Applicant stated that he had to leave, and an argument ensued with Hope about Applicant's frequent absences. Applicant and Hope walked to the store a couple of blocks away and then returned home. During that time, Morris was alone with Tristen. She testified that she was going through bills and talking on the phone, as could be supported by phone records.

After Applicant departed, Hope watched a news broadcast on television. At about 5:40 p.m., Hope checked on Tristen and thought that the child was sleeping. At 6:00 p.m., Hope returned to Tristen's room to wake her up. She saw that the baby was lying in her bed with a pillowcase covering one eye, part of her nose, and her mouth. When Hope moved the pillowcase, she saw that Tristen's lips were blue. Upon picking her up, Hope found that Tristen's body was cold and that she was not breathing.

Hope cried for Morris to call 9–1–1 for assistance and carried Tristen into the living room. There she held Tristen on her lap and tried to breath into her mouth. A pink fluid gurgled up from Tristen's mouth and nose, and Hope inserted a finger into Tristen's throat to attempt to dislodge any object stuck in her throat. Hope then carried Tristen outside, where she yelled for someone to assist her and placed the child on a patch of well-groomed lawn near the front door. Morris and a neighbor's daughter, Pamela Garrison, attempted to perform CPR on Tristen. Morris blew into Tristen's mouth while Garrison pushed with very little force upon the child's abdomen three or four times, using the palm of her hand. Garrison testified that Tristen's skin felt very cold, and she did not hear any air coming out of the baby. Another neighbor, Jackie Sullivan, who had previously worked as an emergency medical technician, approached and told Morris and Garrison to stop because they were performing CPR too forcefully, given the size of the child. Sullivan made a statement to the effect that they would kill the child if she was not dead already. She observed that Tristen was not breathing, that her body was cold, and that her lips were bluish-purple, circumstances

4

leading her to believe that Tristen was dead at that time. Still, Sullivan started to perform infant CPR with two fingers.

An ambulance arrived at 6:08 p.m., and paramedic Elizabeth Fredregill placed Tristen on a stretcher. After several unsuccessful attempts, a breathing tube was inserted into Tristen's larynx. Fire department personnel performed CPR and administered epinephrine during the trip to the hospital. Fredregill observed that Tristen was pale and cold to the touch, that her neck was stiff, and that there was vomit in her airway, and she formed an opinion that Tristen was dead based on her observation of fire department personnel performing CPR. The first base-line EKG was taken in the ambulance at 6:16 p.m.

Tristen arrived at the hospital at 6:36 p.m., and she was immediately examined by Dr. John Conner, who determined that Tristen was "asystole" and without respiration, was cool to the touch, and displayed some dependent lividity, all indicating that she "had been dead for some time." Tristen was placed on monitors to assess her condition, but Conner believed that there was no chance of successful resuscitation. A nurse attempted to determine Tristen's temperature with a rectal thermometer, which continued to display its lowest possible reading of 94 degrees Fahrenheit, thereby signifying that the child's temperature was actually lower than the minimum displayed by the digital thermometer. Conner pronounced Tristen dead at 6:53 p.m. He broke the news to Hope, who was distraught and cried that she did not want to live. Conner testified that Applicant's behavior was unusual in the situation because he attempted to fondle Hope, but other witnesses disputed this testimony.

Subsequently, Justice of the Peace Edie Connelly ordered an autopsy that was performed by the Harris County Medical Examiner's Office (HCMEO), specifically assistant medical examiner Dr. Patricia Moore. Moore noted six or seven contusions on Tristen's legs, which were consistent with normal childhood injuries. She also observed five irregularly shaped, purple bruises on Tristen's back, ranging from one-eighth to one-quarter inch in width; bruises on the right side of her neck; and areas of discoloration on her face and left arm. Moore incised the bruises on Tristen's back with a scalpel and found hemorrhages down to the level of deep subcutaneous tissue. When examining Tristen's internal organs, Moore discovered petechiae (small areas of hemorrhage) on the thymus and the lungs, a small hemorrhage on the kidney, a recent

5

hemorrhage between the intracostal muscles of the eleventh and twelfth ribs on each side, and a hemorrhage of the tonsils. Moore stated that Tristen's heart appeared "pretty good" and the lungs contained "some mucus in the bronchi," which probably resulted from a cold. Upon further examination the next day, Moore found two additional bruises behind Tristen's right ear and another bruise on the right side of her neck.

At trial, Moore, as the State's expert witness, testified that the cause of Tristen's death was asphyxia due to compression of the chest and abdomen and that the manner of death was homicide. She explained that the presence of petechiae on the back of the thymus and lungs indicated an asphyxia-related death. Moore ruled out CPR as the cause of death because the injuries to Tristen's back were inconsistent with the administration of adult CPR and the injury to the kidney was deep down, requiring a lot of force. She also excluded sudden infant death syndrome (SIDS) because of the child's age "and the story doesn't fit the picture of a SIDS baby death." Additionally, Moore stated that Tristen may have been dead for at least three hours before her temperature was taken at the hospital, based upon an approximate post-mortem cooling rate of 1.5 degrees per hour, and that Tristen's body would not have sustained bruises as the result of the application of CPR that long after her death.

On cross-examination, Moore testified that she was assuming that the CPR took place on the floor, so Applicant asked her to imagine that it took place on a floor with sticks and rocks scattered around and that the adults performing CPR were doing so as if Tristen was a strong adult and were applying heavy force on her chest and abdomen. Moore responded that such circumstances could explain the bruises on the back but not the rib injury (although she also acknowledged that if enough pressure was applied to the abdomen, the kidney and ribs could bruise). Moore also asserted that she was not completely excluding other reasonable hypothesis by which Tristen died. Still, it was her opinion that Tristen was asphyxiated, and she believed that beyond a reasonable doubt.

To contravene Moore's testimony, the defense called Dr. Robert Bux, the deputy chief medical examiner for Bexar County, Texas.[4] Bux testified that

---

[4] Bux agreed that SIDS does not apply to this case. He also noted that Tristen did not die from poisoning, as per the

the cause of Tristen's death could not be determined and that no anatomical reason demonstrated during the autopsy could have led to a specific cause of her death. Relying on a treatise, Bux explained that death from asphyxia by compression would have resulted in abundant petechiae above the level of compression (including on the forehead, cheeks, and eyes) as well as abrasions and bruises around the front of Tristen's body that would have occurred during the struggle. But Moore observed none of these during the autopsy. Bux also stated that the occasional petechiae on internal organs observed were a "non-specific finding" and could have resulted from other causes. That is, "[e]ven the presence of abundant petechiae is not a hallmark" and was not "specific for asphyxia." Regarding the time of death, Bux stated that pulseless electrical activity on Tristen's EKG charts could have occurred 30 to 40 minutes after her death, indicating that Tristen's death occurred after 5:30 p.m. when Applicant was not with the baby. When asked about the role of CPR in the injuries, Bux asserted that the bruises on Tristen's back were consistent with the administration of CPR while the child was lying on a lawn that was not prepared for that purpose. Similarly, Bux testified that the rib and kidney injuries could have been caused by frontal pressure during CPR, although he admitted that he had not personally seen a kidney injury due to such occurrence. Bux claimed that bruises can occur after death, explaining that it is possible for there to be a distribution of blood vessels and then the blood runs out and pools because of gravity.

In its rebuttal case, the State offered evidence to contradict Bux's EKG testimony. Fredregill described how the electrodes are attached and the advantages of electrodes over other types of monitors. Kelly Curry, Fredregill's supervisor and the clinical manager for EMS at Montgomery County Hospital District who was trained in and also taught how to read EKGs, testified about interference and artifacts in EKG readings. She explained that the three electrode leads attached to Tristen looked at different directions of the heart and were to be read simultaneously. She dismissed as artifacts any activity on the EKG charts because no organized activity was represented and not all of the leads showed it. One reading did show some movement, but she attributed it to the CPR that was in progress, not heart activity. Finally, Carl Ulbrich, a physician who was working in the emergency room at the same time as Dr. Conner but was not the primary

toxicology report.

7

physician on Tristen's case, reviewed the records and testified that the EKG readings indicated no electrical activity except for mild interference. He noted that the up-and-down pattern on one of the EKG charts was consistent with CPR.

Applicant testified in his defense. He stated that Tristen was affectionate toward him and that on the day of her death, he did nothing to harm Tristen. In fact, he claimed that he had never struck her, abused her, disciplined her, or even raised his voice to her. Yet he admitted causing the three injuries to Tristen, blaming the incidents on his "carelessness." When asked about his turbulent relationship with Hope, Applicant denied that any stress resulted from the fact that Hope came in and out of his life, and although he participated in group counseling with her, he denied being depressed, claiming he attended merely out of concern for Hope. Applicant further commented that he would overlook a lot of things because of his love for Tristen. In addition, Applicant was questioned about the testimony of Bethune that in the month following Tristen's death, Applicant took all of the batteries out of Tristen's toys and then explained to her that "it hurt too much; he couldn't handle the guilt." Applicant responded that he removed the batteries because it hurt him to hear them go off, not due to a feeling of guilt from something that he had done.

During closing arguments, the State emphasized Moore's testimony in arguing that it was Applicant, and only Applicant, who could have caused the asphyxia-related death of Tristen. For his part, Applicant argued that if "anything, he is guilty of the offense of loving a child." Applicant put forth the SIDS scenario and emphasized that the bruises on Tristen's body could have been caused by incorrectly performed CPR efforts to save her life. He also pointed to the testimony of the two medical examiners, arguing that Bux's was the more credible opinion.

On February 22, 1999, the jury found Applicant guilty of capital murder, and Applicant was sentenced to life imprisonment. Approximately a month later, Applicant filed a motion for new trial, arguing that evidence was legally and factually insufficient to establish that Tristen's death was a homicide, but the trial court denied the motion.
. . .
**D. Reevaluation of Autopsy Findings**
In March 2007, an acquaintance of Applicant contacted the HCMEO and asked it to review Moore's findings regarding the cause of Tristen's death.

The deputy chief medical examiner for Harris County, Dr. Dwayne Wolf, undertook a re-evaluation of the autopsy findings. After reviewing the testimony adduced during Applicant's trial, the autopsy report, the EMS and medical records, and the police offense report, Dr. Wolf concluded that Moore's observations during the autopsy did not support a finding that the death resulted from asphyxiation by compression or from any other specific cause. Consequently, on May 2, 2007, Wolf amended Tristen's autopsy report to reflect that both the cause and manner of death was "undetermined." And so on the following day, Justice of the Peace Edie Connelly formally reopened the inquest into Tristen's death.

Shortly thereafter, former Harris County Medical Examiner Joye Carter was asked by the Montgomery County District Attorney's Office to review Moore's autopsy report. Carter had been Moore's supervisor and had agreed with Moore's original opinion. In a May 10 letter to the district attorney, she wrote, "Upon my review of this case I would not concur with the opinion on the manner of death as a homicide but would reconsider this case as an undetermined manner," and "If the Harris County Medical Examiner intends to re-rule this case as an undetermined manner of death I would agree with that change."

Moore, too, was asked by the Montgomery County District Attorney's Office to review her autopsy report. In a May 13 letter to the district attorney, she stated,

> I believe that there are unanswered questions as to why the child died, and I still feel that this is a suspicious death of a young child. Given my review of all the material from the case file and having had more experience in the field of forensic pathology, I now feel that an opinion for a cause and manner of death of undetermined, undetermined is best for this case.

Moore explained that since her original opinion, she has had more experience, and she has reviewed additional information that suggested that the bruises could have resulted from aggressive CPR and other efforts to assist the child.[5] She emphasized that it was significant that aggressive

---

[5]     Although Moore claims that she was previously unaware that " 'aggressive' adult type CPR was performed by persons

9

adult-type CPR by untrained persons was performed on Tristen, a 17–month–old child.

### E. [Original] Habeas Application and Proceedings

On June 4, 2007, Applicant filed his original application for a writ of habeas corpus alleging, "Newly discovered evidence shows that no rational juror would find Applicant guilty beyond a reasonable doubt of the offense for which he was charged and convicted." About a month later, Applicant filed a supplemental application alleging that his "right to a fair trial by a fair and impartial jury ... was violated because his conviction was based on testimony material to the State's case that has now been determined to be false."

In its original response on June 25, 2007, the State recommended that Applicant be granted a new trial because his due process rights to a fair trial and impartial jury were violated. The State claimed that because it relied on Moore's original opinion in presenting its case, which has now been recanted, confidence in the outcome has been undermined. Citing *Ex parte Carmona*, 185 S.W.3d 492 (Tex.Crim.App.2006), the State wrote, "While Dr. Moore's testimony is not perjured testimony, the effect of the change in her opinion is the same—the jury was led to believe and credit facts that were not true."

The same day, Applicant and the State filed agreed findings of fact and conclusions of law. But instead of signing them, on August 22, 2007, the trial court appointed Dr. Thomas Wheeler, the Chairman of the Department of Pathology at Baylor College of Medicine, with the task of conducting an independent pathological examination to address the following issues: (1) What is the manner of Tristen Rivet's death? (2) What is the means of

---

untrained in CPR (infant) on this 17 month child" and that "CPR was performed on a manicured lawn," she was cross-examined about such circumstances at trial. Similarly, she asserted that she has learned since her original opinion that "a finger was placed in the child's mouth to possibly clear the airway and that back blows were done on the child prior to EMS arrival," but these facts were available to Moore, as they were facts obtained during the investigation into Tristen's death and were presented at trial.

Tristen Rivet's death? (3) Are the manner and means of Tristen Rivet's death able to be determined? (4) Does a change in the medical examiner's opinion about the manner and means of Tristen Rivet's death entitle Applicant to a new trial? After reviewing the autopsy file of the victim, trial testimony, and exhibits, Wheeler concluded in a September 18, 2007, letter to the trial court that the cause and manner of Tristen's death were undetermined. Wheeler asserted that "[a]lthough the autopsy performed by Dr. Moore was thorough and well documented, her conclusion that the death of Tristen Rivet was caused by asphyxia secondary to chest compressions was not justified by the objective facts and pathological findings in this case." He could not rule out suffocation or asphyxiation as the cause of death, but he did not see any physical findings that would support any particular conclusion as to the cause of death.

In October 2007, Judge Connelly ordered that pathologist Linda Norton conduct an independent forensic examination of the evidence and submit a written report of her findings and opinion on the cause and the manner of Tristen's death.[6] On March 28, 2008, Norton reported the results of her review during a recorded telephone conference call, in which Judge Connelly and counsel for Applicant and the State participated. Norton stated that it was her opinion that Tristen's death was a homicide and that the manner of death was asphyxia by suffocation. She explained that her conclusion was supported by the petechial hemorrhages on Tristen's lungs and thymus, combined with the other evidence of trauma, and in the context of the other circumstances of Tristen's death. In addition, Norton stated that the correct rule of thumb for assessing temperature loss in a child's body after death is an approximate loss of three degrees per hour, depending upon ambient temperature and other environmental facts. Thus, combining that with Tristen's maximum rectal temperature of 94 degrees at the hospital and the descriptions of Tristen's condition by Sullivan and others, she believed that Tristen's death occurred between 2:30 and 5:00 p.m. Consequently, because the child had been dead for at least an hour before CPR was attempted, the external bruises observed during the autopsy could not have been inflicted during the CPR. Nonetheless, Norton acknowledged that she could not conclude beyond a reasonable doubt that Applicant and

---

[6]     Norton was paid $22,907.50 from Montgomery County general funds, the district attorney's forfeiture account, and funds budgeted to the sheriff's cold case investigation squad.

11

Applicant alone committed the homicide.

Norton also recommended that authorities investigate reports that Applicant had written something on a dollar bill and placed it in Tristen's casket at the funeral home on the date of Tristen's funeral. Ruth Hope (Barbara Hope's mother) and Shelby Becker (Barbara Hope's sister) had executed affidavits indicating that they saw Applicant writing something on a money bill and then placing it in Tristen's coffin. On April 4, 2008, Judge Connelly signed an order directing that Tristen be exhumed for the purpose of retrieving any evidence that might be found in the casket. Six days later, Tristen's remains were exhumed and remnants of a piece of paper resembling United States currency were recovered from the casket liner. Document preservation experts reported on May 6, 2008, that no markings of any kind could be identified due to the poor condition of the paper.

Judge Connelly amended Tristen's death certificate on May 13, 2008, to correspond with Norton's opinion that Tristen's death was caused by asphyxia due to suffocation, rather than asphyxia by compression; the homicide finding was not changed. The following day, Norton executed an affidavit incorporating her conference discussion. In its May 27, 2008, supplemental response, the State was no longer willing to recommend a grant, but it agreed not to oppose Applicant's request for a new trial. It wrote that the "cause of death remains asphyxiation, albeit by suffocation rather than compression, and the manner of death a homicide as presented by the jury at Applicant's trial." On August 6, Wheeler submitted a sworn affidavit, repeating what he had said in his September letter to the trial court, adding that he disagreed with Norton's opinions. That same day, Applicant filed a memorandum on why Moore's amended autopsy should not be found credible.

On August 13, 2008, Applicant, joined by the State, filed proposed joint findings of fact and conclusions of law, which recommended that Applicant be granted a new trial based on due process grounds and the fact that he was denied a "fundamentally fair trial and an accurate result." On August 25, Moore's sworn affidavit was filed, incorporating much of her prior letter to the district attorney. The next day, Applicant, again joined by the State, filed another set of proposed findings and conclusions. Instead of signing it, the trial court ordered that the parties engage in discovery. Moore was deposed on December 10, 2008; Wheeler on December 19, 2008; and Wolf on February 10, 2009. The trial court appointed John Milutin, an attorney

experienced in the deposition of medical experts, to depose these witnesses. Norton was subpoenaed so she, too, could be deposed, but she could not be located. When the trial court granted the State's motion to depose Norton at the location of her choosing, she could not be deposed due to medical problems.[7] Instead, on December 17, 2009, Norton submitted a second affidavit in which she confirmed that she was incapable of preparing for or participating in a deposition, and she adopted and ratified under oath the statements and opinions she expressed during the previous telephone conference, including that she believed Tristen died from suffocation and that her death was homicide. Based largely on Norton's opinion, on December 22, the State filed its second supplemental response and recommended that relief be denied. Shortly thereafter, Applicant filed an objection to Norton's affidavit, arguing that, given her unwillingness to be deposed, the trial court should not consider her affidavit.

On December 29, 2009, Judge Connelly conducted an evidentiary hearing on Applicant's motion to reopen the inquest into Tristen's death to allow consideration of additional expert medical testimony. Applicant also filed a motion to reopen the inquest into Tristen's death after her death certificate was amended to show she died of suffocation, but this motion was denied because "on the basis of examination and investigation, in the opinion of this Court, the cause and manner of the death of Tristin Skye Rivet, as shown on the amended death certificate ..., is cause: asphyxia due to suffocation, manner: homicide."

---

[7] Norton's daughter informed the State that Norton's office administrator and close personal friend had died of an apparent self-inflicted gunshot wound at the residence she shared with Norton. Subsequently, Norton suffered from an unspecified health problem that required a "leave of absence" from her medical practice. When the court ordered that the parties take the deposition at a location of Norton's choosing, Norton had closed her office and vacated her home, so she could not be located by the investigator who sought to serve her with a copy of the court order. Norton then informed counsel by telephone that she was under a doctor's care and could not currently be medically cleared to participate in a deposition.

On January 15, 2010, the State filed its proposed findings of fact and conclusions of law, which recommended that relief be denied. Days later, Applicant filed his proposed findings and conclusions. On January 21, the State filed its first supplemental brief in support of its proposed findings and conclusions. While not willing to concede that Applicant properly raised a due process claim in his supplemental ground for relief, the State argued that, even if he did raise due process, the Court "has not yet held—and it seems unlikely that it will ever hold—that the Due Process Clause is violated when a witness provides, in good faith, an opinion that is believed to be true by both the witness and the prosecution at the time of trial, even if that opinion is subsequently challenged by other experts or reconsidered by the witness who offered it."

The next day, on January 22, 2010, the trial court permitted oral argument. Applicant argued that Moore's re-evaluation was newly available evidence and that *Ex parte Elizondo*, 947 S.W.2d 202 (Tex.Crim.App.1996), requires that the newly available evidence be evaluated within the four corners of the trial transcript.[8] Further, Applicant asserted that due process and fairness require that the jury have the opportunity to re-weigh the evidence. In contrast, the State contended that Applicant could not establish that he was actually innocent because the evidence is not newly discovered, the re-evaluation was not indisputable, and there was other evidence of Applicant's guilt. Regarding the due process claim, the State argued that Applicant had failed to raise it as a supplemental ground, and it doubted whether there was a legal and factual basis for his due process claim: "It's hard to believe that a violation of due process is established by evidence that an expert opinion may have been correct or it may have been incorrect."

The trial court made twenty-two pages of detailed findings of fact, much of which is summarized above, and five pages of conclusions of law. The trial court recommended that we grant Applicant a new trial because his due

---

[8]     Applicant stated that by "false evidence," he meant evidence that is "interchangeable with discredited, inaccurate, incorrect, unvalid, unfounded, whatever term of art this Court chooses to use." He further noted that Moore's change of opinion was not a recantation but instead a reevaluation, so it deserved more deference.

14

process and due course of law rights were violated, as was his right to an impartial jury.[9]

This Court denied the applicant's original application for writ of habeas corpus.[10] On September 3, 2013, the applicant filed a subsequent application for writ of habeas corpus pursuant to article 11.073 of the Texas Code of Criminal Procedure. The trial court recommended that relief be granted, and the State objected to its findings and recommendations. We ordered that the application be filed and set for submission.

### Subsequent Application for Writ of Habeas Corpus

This Court may consider a subsequent application only if "the current claims and issues have not been and could not have been presented previously in an original application or in a previously considered application filed under this article because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application ...."[11]

As stated previously, no new factual bases for a claim have emerged since the applicant filed his original application. The question remains whether the enactment of 11.073 created a new legal basis for a claim.

Article 11.07 defines what makes a legal claim unavailable:

For purposes of Subsection (a)(1), a legal basis of a claim is unavailable on

---

[9] *Robbins*, 360 S.W.3d at 448-57.

[10] *Robbins*, 360 S.W.3d at 463.

[11] TEX. CODE CRIM. PRO. 11.07, § 4(a)(1).

15

or before a date described by Subsection (a)(1) if the legal basis was not recognized by and could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.[12]

Article 11.073 was enacted on September 1, 2013, six years after the applicant filed his original application. Prior to the enactment of article 11.073, newly available scientific evidence *per se* generally was not recognized as a basis for habeas corpus relief and could not have been reasonably formulated from a final decision of this Court or the United States Supreme Court, unless it supported a claim of "actual innocence" or "false testimony."[13] This Court held in the applicant's first habeas proceeding that his claim did not satisfy the requirements for either actual innocence or false testimony.[14]

Article 11.073 provides a new legal basis for habeas relief in the small number of cases where the applicant can show by the preponderance of the evidence that he or she would not have been convicted if the newly available scientific evidence had been presented at trial.

An applicant also must establish "that the facts he alleges are at least minimally

---

[12] TEX. CODE CRIM. PRO. 11.07, § 4(b).

[13] *See Ex parte Binder*, 660 S.W.2d 103, 106 (Tex. Cr. App. 1983) ("the mere raising of a claim of newly discovered evidence is, standing alone, not a fit subject for the exercise of state or federal habeas corpus powers"). *See also Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Cr. App. 1996) (articulating the standard for a bare claim of actual innocence in post-conviction habeas proceedings); *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Cr. App. 2011) (false testimony can constitute a violation of due process whether used by the State knowingly or unknowingly when there is a "reasonable likelihood" that the false testimony affected the outcome).

[14] *Robbins*, 360 S.W.3d at 460, 463.

16

sufficient to bring him within the ambit of that new legal basis for relief."[15] In this case the applicant has alleged prima facie facts in his application sufficient to invoke the new law – there is arguably relevant scientific evidence that contradicts scientific evidence relied on by the state at trial, and that evidence was not available at trial because Moore re-evaluated her opinion after trial. Although similar information was presented by a defense expert at trial, Dr. Bux, the evidence at issue is the State's evidence regarding cause of death, which has been contradicted.

The applicant has met the requirements for submission of a subsequent application, and we now proceed to consider the merits of this application.

## Article 11.073

The applicant argues he is entitled to relief under article 11.073 because Dr. Moore, the medical examiner who performed the autopsy and testified for the State, has re-evaluated her testimony and opinion and can no longer stand by her trial testimony that Tristen's death was a homicide. Moore now believes, as stated in her May 13, 2007, letter to the district attorney, "that an opinion for a cause and manner of death of undetermined, undetermined [*sic*] is best for this case."

This evidence regarding the cause of death is relevant scientific evidence that contradicts scientific evidence relied on by the State at trial: Moore's testimony. During

---

[15] *Ex Parte Oranday-Garcia*, 410 S.W.3d 865, 867 (Tex. Cr. App. 2013) (expanding the requirement that a subsequent writ application must allege facts sufficient to make out a prima facie case for relief under the new law the applicant is attempting to invoke to avoid dismissal under Section 4, art. 11.07).

17

the applicant's trial, the State repeatedly emphasized Moore's testimony that this was homicide by asphyxiation.

We hold that article 11.073 applies to this evidence under section (a)(2).[16]

**Availability of Scientific Evidence**

In order to obtain relief, the applicant must include in his application specific facts showing the "relevant scientific evidence is currently available and was not available at the time of [his] trial because the evidence was not ascertainable through the exercise of reasonable diligence by the convicted person before the date of or during [his] trial."[17] Article 11.073 (d)(1) and (2) provide guidance to the Court in how to make this determination:

> In making a finding as to whether relevant scientific evidence was not ascertainable through the exercise of reasonable diligence on or before a specific date, the court shall consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed since:
> (1) the applicable trial date or dates, for a determination made with respect to an original application; or
> (2) the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application.

Article 11.073 requires the Court to consider "whether the scientific knowledge or method on which the relevant scientific evidence is based has changed." Scientific

---

[16] "This article applies to relevant scientific evidence that: ... (2) contradicts scientific evidence relied on by the state at trial."

[17] Article 11.073(b)(1).

18

method is defined as "[t]he process of generating hypotheses and testing them through experimentation, publication, and republication."[18]

The process used by Moore did not change, and there is no argument from either the applicant or the State that methods for analyzing the cause of child death in a case like this have changed in the scientific community, as have other areas of science recently considered by this Court.[19] The remaining question before this Court is whether the "scientific *knowledge* ... on which the relevant scientific evidence is based has changed" (emphasis added). Moore's conclusion certainly has changed, but does "scientific knowledge" apply to the knowledge of an individual?

The United States Supreme Court defined scientific knowledge when explaining what constitutes admissible "scientific knowledge" testimony from an expert witness.

> The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." Of course, it would be unreasonable to conclude that the subject of scientific testimony must be "known" to a certainty; arguably, there are no certainties in science. But, in order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by

---

[18] BLACK'S LAW DICTIONARY 1547 (10th ed. 2014).

[19] *See, e.g., Ex parte Henderson*, 384 S.W.3d 833, 833-34 (Tex. Cr. App. 2012) (remanding for a new trial where new developments in the science of biomechanics led the medical examiner who testified at trial to testify at the evidentiary hearing that he now believed "there is no way to determine with a reasonable degree of medical certainty whether [his] injuries resulted from an intentional act of abuse or an accidental fall").

19

appropriate validation— i.e., "good grounds," based on what is known.[20]

The Supreme Court laid out several factors for determining whether something qualifies

as scientific knowledge under its definition, which are incorporated into the definition of

"scientific knowledge" provided in Black's Law Dictionary:

> Knowledge that is grounded on scientific methods that have been supported
> by adequate validation. Four primary factors are used to determine whether
> evidence amounts to scientific knowledge: (1) whether it has been tested;
> (2) whether it has been subjected to peer review and publication; (3) the
> known or potential rate of error; and (4) the degree of acceptance within the
> scientific community.[21]

Moore's opinion at trial on the cause of death was admissible scientific evidence, based

on inferences derived from the scientific method. Dr. Wheeler, Chairman of the

Department of Pathology at Baylor College of Medicine, stated in his letter to the trial

court that "the autopsy performed by Dr. Moore was thorough and well documented," but

her original conclusion was not supported by the autopsy.[22]

Her new opinion that the cause of death is "undetermined," which the applicant

argues is the "change in scientific knowledge," is also an inference or assertion supported

by appropriate validation based on the scientific method. Moore's revised opinion on the

cause of death satisfies the requirements to be called "scientific knowledge,"and thus falls

---

[20] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[21] BLACK'S LAW DICTIONARY 1004 (10th ed. 2014).

[22] *See supra* p. 10.

within the language of article 11.073. Moore's opinion labeling cause of death as "undetermined" was not available at the time of trial because her scientific knowledge has changed since the applicable trial date.

The State argues Moore's re-evaluated opinion was available at trial because the same information was presented by the defense through Dr. Bux. We disagree. The relevant evidence is the State's evidence on Tristen's cause of death. It has changed. Moore's re-evaluated opinion on cause of death contradicts the evidence relied on by the State at trial and was not available at that time because she re-evaluated years after the trial ended.

### Admissibility and Probable Outcome

Both the State and the applicant agree that, if it had been available at trial, Moore's opinion regarding the cause of death would be admissible under the Texas Rules of Evidence.

Finally, we find on the preponderance of the evidence that, had this evidence been presented at trial, the applicant would not have been convicted. Moore's original trial testimony was the only evidence presented claiming conclusively that Tristen died as the result of a homicide. The State also emphasized her testimony in its closing statement when arguing to the jury that the applicant caused Tristen's death. It is hard to imagine any reasonable jury's returning a conviction when no one can even say confidently that a murder has been committed.

## Conclusion

We grant the applicant's request for relief, set aside the applicant's conviction in cause number 98-06-00750-CR, and order that the applicant be remanded to the Sheriff of Montgomery County to answer the charges against him.


Delivered November 26, 2014.
Publish.